IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 12, 2024 Session

**STATE OF TENNESSEE v. LACORIOUS TYQUEZ FULLER**

**Appeal from the Circuit Court for Rutherford County**
**No. F-83924          James A. Turner, Judge**

_____

**No. M2023-00694-CCA-R3-CD**

_____

Defendant, Lacorious Tyquez Fuller, appeals his Rutherford County Circuit Court conviction for conspiracy to deliver more than 150 grams of heroin, for which he received a sentence of 17 years' incarceration. On appeal, Defendant challenges the sufficiency of the convicting evidence and the trial court's admission of a video recording of a controlled purchase between Defendant and two confidential informants. Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., joined. JAMES CURWOOD WITT, JR., J.,[1] not participating.

Jessica Fay Butler, Assistant Public Defender – Appellate Division (on appeal); Gerald L. Melton, District Public Defender; and Benjamin Ray Wetsell and Brittney Hollis, Assistant District Public Defenders (at trial), for the appellant, Lacorious Tyquez Fuller.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Eric Farmer and Matthew Westmoreland, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

---

[1] The Honorable J. Curwood Witt, a former presiding judge who served on this court for twenty-seven years, died during the pendency of this appeal. We thank him for his enduring commitment to this Court and the rule of law.

In July of 2019, the Rutherford County Grand Jury indicted Defendant and two coconspirators, Matthew James and Brian Ayers, for conspiracy to deliver more than 150 grams of heroin in Rutherford County.[2] The indictment specifically alleged that between April and September of 2018, Defendant "gave heroin to [Mr.] James and [Mr.] Ayers to sell in Rutherford County," that Mr. James and Mr. Ayers "pick[ed] up heroin from Defendant and s[old] said heroin in Rutherford County," and that Mr. James and Mr. Ayers "repa[id] Defendant for the fronted heroin."

*Evidence at Trial*

At Defendant's April 2022 trial, Tennessee Bureau of Investigation ("TBI") Special Agent Dennis Mabry testified that he began investigating an individual using the street name "Fifty," who he suspected of selling narcotics in Rutherford County in late August or early September of 2018. In early September, Mr. Ayers and Mr. James were arrested and agreed to become confidential informants in the investigation into Fifty. Special Agent Mabry recalled that prior to their becoming confidential informants, Mr. Ayers and Mr. James frequently met with Fifty to purchase heroin. Special Agent Mabry testified that during these meetings, Mr. Ayers and Mr. James purchased an amount of heroin for personal use and received that amount plus a "fronted" portion, which they sold throughout Rutherford County and the proceeds of which they returned to Fifty at their next meeting. By the time they became confidential informants, Mr. Ayers and Mr. James owed Fifty approximately $10,500.

At Special Agent Mabry's request, Mr. Ayers and Mr. James scheduled a controlled purchase of heroin from Fifty on September 7, 2018. The confidential informants traveled from Rutherford County to meet with Fifty in the parking lot of a Nashville apartment complex. Special Agent Mabry surveilled the exchange but was unable to identify Fifty, though he noted that Fifty drove a white Jeep Grand Cherokee with a New Mexico license plate. During the controlled purchase, the confidential informants exchanged $6,000, which had been given to them by the TBI, for a clear plastic bag containing 98 grams of heroin. The confidential informants gave the heroin to Special Agent Mabry, who sent it to the Metro Nashville Police Department's Crime Lab for testing. After the controlled purchase, Fifty called the confidential informants to inform them that they had not paid him enough for the heroin. Special Agent Mabry stated that he had intentionally given the confidential informants insufficient funds in case he and other detectives working on the case needed an additional opportunity to identify Fifty.

---

[2] Defendant was also indicted for second degree murder by dispensing fentanyl or carfentanil and possession with the intent to sell or deliver more than 150 grams of heroin in a drug free school zone. Before trial, the court dismissed the possession charge and the State nolled the second-degree murder charge.

A second meeting between Fifty and the confidential informants was scheduled for September 21, 2018, in which the confidential informants ostensibly intended to repay a portion of their debt to Fifty. Mr. Ayers and Mr. James again traveled to Nashville from Rutherford County and, upon arriving, Mr. James parked his vehicle adjacent to the same white Jeep Grand Cherokee that Fifty drove during the September 7 controlled purchase. Special Agent Mabry testified that he was in his car "right behind the confidential informants" during the exchange and identified the driver of the white Jeep Grand Cherokee as a "light-skinned young black male with braids." Special Agent Mabry suspected that Fifty saw him during the exchange, as Fifty quickly "sped away" from the confidential informants after receiving payment. Nevertheless, Special Agent Mabry was able to record the white Jeep Grand Cherokee's license plate number. After checking the vehicle's registration, Special Agent Mabry learned that the white Jeep Grand Cherokee was a rental leased to Lashonda Parker, Defendant's mother. Upon further investigation into Ms. Parker and after obtaining a photograph of Defendant, Special Agent Mabry identified Defendant as Fifty.

On cross-examination, Special Agent Mabry testified that he was unaware that Mr. James and Mr. Ayers had purchased heroin from other suppliers at the same time they purchased heroin from Fifty. He recalled that prior to the September 7 controlled purchase, Mr. Ayers and Mr. James informed him that they knew Fifty to drive a white Jeep Grand Cherokee, among other vehicles. He also stated that he learned during his investigation that Defendant had a sibling but that he quickly eliminated this sibling as a suspect after seeing a photograph of Defendant. Special Agent Mabry conceded that he was only able to see Defendant's face for a few seconds before he "sped away." He testified that he did not believe Defendant had personally sold drugs in Rutherford County.

Rutherford County Sheriff's Office Detective James McFerrin testified regarding his investigation into Mr. James, who he suspected of selling drugs throughout Rutherford County. With the assistance of an unidentified confidential informant, Detective McFerrin arranged a series of controlled purchases from Mr. James. The unidentified confidential informant's vehicle was equipped with audio and video recording equipment which recorded controlled purchases on August 10, August 16, August 24, and September 5, 2018. Video recordings of each of these purchases were played for the jury. Detective McFerrin identified Mr. James in these video recordings as driving a gray Dodge Charger and noted that each transaction took place in Rutherford County.

After the September 5 controlled purchase, Detective McFerrin and several other officers traveled to Mr. James's home. Mr. James was not present when Detective McFerrin arrived but drove towards his home in a gray Dodge Charger along with Mr. Ayers shortly thereafter. Following a traffic stop, Mr. James consented to a search of his vehicle, and officers discovered heroin, a digital scale, and approximately $16,000 in

cash therein. Detective McFerrin identified a portion of this cash from his previous controlled purchases with Mr. James. Mr. Ayers and Mr. James were subsequently arrested and taken to the Rutherford County Sheriff's Office for interviews.

During their interviews, Mr. James and Mr. Ayers estimated that they had sold between 6.5 and 10 kilograms of heroin in Rutherford County between April and August of 2018. They gave Detective McFerrin a list of the individuals who had supplied the heroin they sold. The list included Fifty. Mr. James and Mr. Ayers stated that they had intended to use the cash recovered from Mr. James's vehicle to repay their debts to Defendant. Following their interviews, Mr. James and Mr. Ayers agreed to work for the Rutherford County Sheriff's Office as confidential informants.

As confidential informants, Mr. James and Mr. Ayers were first tasked with placing a controlled phone call with Defendant, a recording of which was played for the jury. During this phone call, dated September 6, 2018, Defendant reminded the confidential informants of their outstanding debts and arranged to meet with them in Nashville the following day.

Following the September 6 phone call, Detective McFerrin installed audio and video recording equipment in Mr. James's vehicle. On September 7, Detective McFerrin and several other officers met with Mr. James and Mr. Ayers at "a location on the southwest side of Nashville" to give them several thousand dollars to use for the controlled purchase. A recording of the September 7, 2018 controlled purchase was played for the jury. The recording, taken from the front seat of Mr. James's vehicle, depicted Mr. James driving and parking his vehicle beside a white vehicle. Mr. James then handed a dark-colored plastic bag to the driver of the white vehicle. Mr. James and Mr. Ayers spoke briefly with the driver before the driver threw a clear plastic bag into Mr. James's lap and drove away. The recording did not capture any images of the driver's face due to the angle at which the camera had been installed.

Defendant called the confidential informants shortly after the September 7 controlled purchase to tell them they had not paid him enough to satisfy their debt. At the behest of the TBI, the confidential informants later called Defendant to schedule a second meeting on September 21. Recordings of these phone calls were played for the jury.

A recording of the September 21 meeting was also played for the jury. During the exchange, Mr. James again parked his vehicle adjacent to a white vehicle. Upon arriving, Mr. James handed a package to the driver, who again threw a plastic-wrapped package into Mr. James's lap. After the exchange, the driver quickly drove away from Mr. James's vehicle. The driver's face was briefly visible in the recording, and, after comparing the recording with a photograph of Defendant, Detective McFerrin concluded that Defendant was "obviously a match to the person that was driving that vehicle that day."

Detective McFerrin testified that he interviewed Defendant after the September 21 exchange. During this interview, he asked Defendant whether he would be interested in becoming a confidential informant, since Detective McFerrin knew Defendant was "not the source of supply" and was "getting the heroin from someone who is a larger source of supply than he is." Defendant declined this offer.

On cross-examination, Detective McFerrin testified that Mr. Ayers and Mr. James owed Defendant approximately $16,000, of which $10,000 related to previous purchases and $6,000 related to their controlled purchases. He stated that no drugs were transferred between the confidential informants and Defendant during the September 21 exchange because that meeting had been designed to provide officers an additional opportunity to identify Defendant.

Detective McFerrin further testified that he learned from his interview with Mr. Ayers and Mr. James that they typically drove to Davidson County to purchase drugs from Defendant between one and three times per week. The two took a small portion of the drugs Defendant provided to them for their personal use and then sold the remainder throughout Rutherford County.

Mr. Ayers testified that he began purchasing heroin from Defendant prior to April of 2018. He recalled that he, along with Mr. James, would visit Defendant at "any spot" Defendant chose for these transactions. Over time, Mr. Ayers and Mr. James began to visit Defendant with greater frequency, ultimately meeting "every day . . . or every other day" until Defendant "got tired" of their visiting him so often. During an exchange in Davidson County at some point "after April of 2018," Defendant gave Mr. Ayers and Mr. James more heroin than they had purchased and instructed them to return to him with a certain sum of money. Mr. Ayers testified that Defendant took photographs of his and Mr. James's driver's licenses during this meeting, which Mr. Ayers believed was to ensure that Defendant had their address in the event they failed to repay him or tried to rob him. After this encounter, Mr. Ayers and Mr. James arranged visits with Defendant less frequently, meeting only "every three to four days."

Mr. Ayers testified that he and Mr. James sold heroin for Defendant from April through September of 2018. Mr. Ayers recalled that a typical purchase with Defendant involved their driving to a Davidson County location of Defendant's choosing, Defendant's parking his vehicle adjacent to Mr. James's, and exchanging cash for drugs. The heroin was contained in a "pack," while the cash was contained in a "bag or something." After the exchange, Defendant "yell[ed] out" a number to represent the amount of money Mr. Ayers and Mr. James were to return to him during their next meeting. Mr. Ayers testified that he and Mr. James sold Defendant's heroin "mostly in Rutherford County."

Mr. Ayers stated that Defendant ran out of heroin "maybe once or twice" between April and September of 2018, and that during these periods, Mr. Ayers purchased from other suppliers. He testified that Defendant gave them differing amounts of heroin, but estimated that, on average, he and Mr. James received 150 grams to sell. Mr. Ayers testified that he became a confidential informant for the Rutherford County Sheriff's Office after his September 5, 2018 interview with Detective McFerrin and that he thereafter coordinated several recorded telephone calls and controlled purchases with Defendant. He also testified that Defendant drove a variety of "nice cars" to their exchanges, including a Camaro, a Mercedes, and a white Jeep Grand Cherokee.

The recording of the September 21 controlled purchase was again played for the jury. After identifying himself and Mr. James, Mr. Ayers identified Defendant as the driver of the white vehicle shown in the video recording as well as the individual with whom he spoke during the telephone call recordings.

On cross-examination, Mr. Ayers clarified that Defendant never explicitly asked Mr. Ayers or Mr. James to sell heroin for him, but simply provided them with large quantities of heroin with instructions to return to him with a specified sum of money at their next meeting. He also testified that Defendant never instructed them to sell heroin for him in Rutherford County and that neither he nor Mr. James discussed what they did with the drugs with Defendant. He stated that he took a portion of the heroin he received from Defendant for personal use and recalled that some "batches" were less potent than others. He recalled that he felt nervous when Defendant took photographs of his driver's license because "[i]t was a lot of money to be held accountable for" and he "didn't want that responsibility."

Mr. Ayers testified that though he had purchased heroin from other sources prior to his association with Defendant, once Defendant began "fronting" him large quantities of heroin, he met "mostly" with Defendant. He recalled that Mr. James purchased drugs from other sources during their association with Defendant but stated that he did not accompany Mr. James for these purchases.

Mr. James testified that he first met Defendant through Mr. Ayers, who described him as an individual from Madison, Tennessee, who could sell them heroin at lower prices than other sources. At their first meeting, Mr. James and Mr. Ayers purchased 3.5 grams of heroin for personal use from Defendant. Afterwards, Mr. James and Mr. Ayers purchased progressively larger amounts of heroin from Defendant, up to two ounces at a time.

Mr. James testified that on one occasion, he and Mr. Ayers met Defendant at a Kroger in Nashville. During this exchange, Defendant gave Mr. Ayers and Mr. James two more ounces of heroin than they had purchased and a "sack on the side to use." He also took photographs of their driver's licenses. Afterward, Defendant informed Mr.

James and Mr. Ayers that they now owed him "a substantial amount of money," so Mr. James and Mr. Ayers began selling the heroin throughout Murfreesboro to repay their debt to Defendant. Mr. James testified that he and Mr. Ayers met with Defendant "at least three times per week" between April and September of 2018 and that Defendant provided them with large quantities of heroin, ranging from "[four] ounces to 200 grams." He averred that he never knew ahead of time how much heroin Defendant would give him and Mr. Ayers but that Defendant would "always throw us a different amount . . . in like a sock or hand it to us in . . . a shoe box or something like that." Mr. James believed that Defendant must have known that he and Mr. Ayers sold Defendant's heroin in Rutherford County because Defendant photographed their driver's licenses, which listed their home addresses in Rutherford County, and because he and Mr. Ayers often told Defendant that they would be traveling from Rutherford County to Nashville to meet him during their phone calls.

Mr. James testified that he occasionally purchased heroin for personal use from other dealers, but that he nevertheless continued to sell Defendant's heroin. He noted that he knew Defendant to drive a white Jeep Grand Cherokee with tinted windows and identified Defendant in the September 21 video recording.

Mr. James also testified that he and Mr. Ayers were charged as Defendant's accomplices and that Mr. James's case was still pending. He stated that he had not been promised leniency from the State in exchange for his testimony against Defendant.

On cross-examination, Mr. James testified that he knew Defendant as Fifty throughout their association and only learned Defendant's legal name from the news after Defendant's arrest. He agreed that he had made no explicit agreement with Defendant to sell Defendant's heroin in Rutherford County and maintained that he and Mr. Ayers were simply expected to return with the amount of money Defendant demanded at their next meeting. On redirect examination, he testified that he sold more than 150 grams of heroin throughout Rutherford County at Defendant's behest between April and September of 2018.

The State rested. After a *Momon* colloquy, Defendant elected not to testify and did not present additional proof. Upon this evidence, the jury convicted Defendant as charged. After a hearing, the trial court sentenced Defendant to 17 years of incarceration. Defendant filed a timely but unsuccessful motion for new trial and this timely appeal followed. On appeal, Defendant challenges the sufficiency of the convicting evidence and the trial court's admission of the video recording of the September 7 controlled purchase.

***Analysis***

*Sufficiency*

- 7 -

Defendant's arguments regarding the sufficiency of the convicting evidence largely center around his contention that the testimony of the accomplices was insufficiently corroborated. Defendant also argues that the State insufficiently identified him as Fifty and failed to prove the existence of a criminal conspiracy because the convicting evidence was largely taken from outside the timeframe of the alleged conspiracy. We will address these arguments in turn.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)); *see* Tenn. R. App. P. 13(e). When this Court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). Circumstantial evidence alone may be sufficient to sustain a conviction. *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this Court shall not substitute its inferences for those drawn by the trier of fact. *Id*.

"It is an offense for a defendant to knowingly . . . [d]eliver a controlled substance . . . or . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(2), (4) (2022). The term "possession" embraces both actual and constructive possession. *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). In order for a person to "constructively possess" a drug, that person must have "'the power and intention at a given time to

exercise dominion and control over . . . [the drugs] either directly or through others.'" *Id*. (quoting *State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981)). Additionally, "it may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419.

Tennessee Code Annotated section 39-12-103(a) defines the offense of conspiracy as follows:

> The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

A defendant may not be convicted of conspiracy to commit an offense "unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d). The essential feature of the crime of conspiracy is the "agreement to accomplish a criminal or unlawful act." *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998). To prove a conspiracy, the State need not show a formal agreement between the parties to commit the unlawful act. *See id.*; *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993); *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). Rather, "a mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement." *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992); *see Randolph*, 570 S.W.2d at 871. "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise." *Randolph*, 570 S.W.2d at 871.

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Cribbs*, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. *Thompson*, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005) (citing *Strickland*, 885 S.W.2d at 87).

Defendant asserts that the State failed to sufficiently corroborate the testimony of Mr. Ayers and Mr. James. The Tennessee Supreme Court recently abolished the requirement for corroborative testimony for accomplices, but because it did so only on a prospective basis and because this appeal was already pending when that decision was announced, we will apply our former common law accomplice corroboration rule to this case. *State v. Thomas*, 687 S.W.3d 223, 229 (Tenn. 2024).

The accomplice-corroboration rule held that "[a] conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 46 S.W.3d 689, 696-97 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). However, only slight corroboration was required. *See Hawkins v. State*, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971). The rule set forth by our supreme court was as follows:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963). Because accomplices cannot corroborate each other, cases involving multiple accomplices require additional corroboration. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001) (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995)).

We conclude that the testimony of Mr. Ayers and Mr. James as accomplices was sufficiently corroborated. Both Mr. Ayers and Mr. James testified that Defendant drove a variety of vehicles including a white Jeep Grand Cherokee. Detective McFerrin and Special Agent Mabry corroborated this testimony by testifying that they saw Defendant driving such a vehicle during the exchanges. Further, a recording of the September 21 meeting, which captured an image of the driver's face and which Detective McFerrin and Special Agent Mabry used to identify Defendant as Fifty, was played for the jury. Mr. Ayers and Mr. James also testified that during their association with Defendant, they met him at a location which Defendant chose in Davidson County to purchase heroin. They

parked their vehicle adjacent to Defendant's vehicle, or vice versa, and exchanged cash for heroin by throwing packages to one another or passing it between their vehicles. Detective McFerrin and Special Agent Mabry corroborated this testimony through their own observations regarding the exchanges between the confidential informants and Defendant. This corroborative evidence further helped lead to the inference that Defendant participated in the charged conspiracy.

Defendant argues that proof of transactions between the confidential informants and Defendant occurring after the conclusion of the charged conspiracy is insufficient to corroborate the accomplices' testimonies. We note that though the face of Defendant's indictment lists the charged conspiracy as occurring between two relatively imprecise dates—"between the dates April 2018 through September 2018"—our review of the record indicates that the charged conspiracy concluded on September 5, 2018. The parties, both at trial and on appeal, agreed that the conspiracy began in early April when Defendant began supplying Mr. James and Mr. Ayers with large amounts of heroin and concluded when Mr. James and Mr. Ayers became confidential informants with the Rutherford County Sheriff's Office on September 5, 2018. The trial court also specifically instructed the jury that events occurring between September 6 and September 21, 2018 were "outside the scope of the [c]onspiracy alleged by the State in the [i]ndictment." However, such proof may be considered to help corroborate the accomplices' testimonies because the accomplice-corroboration rule does not require corroborative evidence to be sufficient to convict Defendant but rather that it be sufficient to "fairly and legitimately tend[] to connect [Defendant] with the commission of the crime charged." *Boxley*, 76 S.W.3d at 386. We agree with the reasoning of the trial court and conclude that the proof in this case does just that. The accomplice testimony was sufficiently corroborated.

Defendant next contends that the evidence adduced at trial was insufficient to identify him as Fifty or to prove the existence of a conspiracy to deliver more than 150 grams of heroin.

First, we conclude that the evidence was sufficient to identify Defendant as Fifty. Though Mr. Ayers and Mr. James testified that they did not know Defendant's legal name until after his arrest, they nevertheless identified him as the individual they knew as Fifty. They further testified that they knew Fifty to drive a white Jeep Grand Cherokee and that such a vehicle was used during the September 7 controlled purchase. Though officers were unable to identify Fifty during that meeting, the recording of the September 21 exchange captured an image of his face, and Detective McFerrin and Special Agent Mabry identified him as Defendant. The jury reviewed each of these recordings and rationally concluded that the evidence sufficiently identified Defendant as Fifty by convicting him.

Defendant next argues that the evidence was insufficient to establish the existence of a criminal conspiracy to deliver more than 150 grams of heroin in Rutherford County. In support of this argument, Defendant argues that there was no "meeting of the minds" between Defendant and his accomplices and that there was no evidence establishing that Defendant "tacitly or explicitly ordered, requested, assisted, or even condoned" the sale of heroin throughout Rutherford County.

Viewing the evidence in the light most favorable to the State, we conclude that the evidence adduced at trial sufficiently established Defendant's guilt. Mr. Ayers and Mr. James both testified that during their meetings with Defendant between April and September of 2018, Defendant provided them with a large amount of heroin, up to 200 grams at a time, and announced a sum of money they were to return to him. Mr. Ayers and Mr. James sold this heroin throughout Rutherford County. At their next meeting, Mr. Ayers and Mr. James gave Defendant the proceeds of their drug sales and received another batch of heroin from Defendant with instructions to return with a new sum of money to repay him. Though Mr. Ayers testified that neither he nor Mr. James discussed what they did with the drugs with Defendant, Defendant knew that Mr. Ayers and Mr. James lived in Rutherford County and traveled from there to Nashville for their meetings. This evidence is sufficient for a rational jury to find the existence of a mutual implied understanding between Defendant and his accomplices to deliver heroin into Rutherford County. We will not disturb the jury's conclusion.

*Tennessee Rule of Evidence 404(b)*

Defendant also challenges the trial court's admission of the recording of the September 7 controlled purchase. On September 2, 2020, Defendant filed a motion in limine seeking to exclude the recording from use at trial, and the trial court held a hearing on the motion on February 2, 2022, pursuant to Tennessee Rule of Evidence 404(b).

During the Rule 404(b) hearing, Defendant argued that the September 7 controlled purchase was outside the relevant timeframe for the charged criminal conspiracy because Mr. James and Mr. Ayers abandoned the criminal conspiracy by becoming confidential informants on September 5. Defendant also argued that the video recording of the September 7 controlled purchase was not proof of his identity through a common scheme or plan because the characteristics of the transaction were not so distinctive or unique as to make it Defendant's signature manner of dealing. In support of this argument, Defendant contended that the location at which he and the confidential informants met during the controlled purchase bore no significance, and the transaction did not include any unique or distinctive form of delivery. In the alternative, Defendant argued that Mr. Ayers's and Mr. James's "more reliable" testimonies regarding the September 7 controlled purchase should be preferred over the potentially prejudicial recording.

The State responded that the recording served to corroborate Mr. Ayers's and Mr. James's testimonies regarding both the September 7 controlled purchase and their customary manner of dealing with Defendant. The State also argued that the evidence was not unduly prejudicial.

In its written order denying Defendant's motion, the trial court found the video recording relevant because it helped prove Defendant's identity through a common scheme or plan and Defendant's intent to continue participating in the charged conspiracy. The trial court reasoned that though the charged conspiracy had concluded by September 7, the "co-conspirators in the video were returning funds to [Defendant] . . . [which] represented the proceeds of illegal narcotic sales that [were] the subject of the conspiracy allegations in the indictment." The trial court thus found that the recording captured evidence of "the completion of the same, continuing criminal transaction contained in the indictment." The trial court also determined that Defendant's statement to Mr. James and Mr. Ayers "to call him later to 'see what's going on'" was proof of his continuing "intent to engage in an ongoing conspiracy." Finally, the trial court found, by clear and convincing evidence, that the recording captured evidence that was the subject of Defendant's indictment and that the recording's probative value was "extremely high" when balanced against the risk of unfair prejudice. The trial court noted that it would nevertheless provide a limiting instruction to the jury to limit any prejudicial effect. At trial, the trial court instructed the jury to consider the recording "for the limited purpose of determining whether it proves [Defendant]'s identity."

In this appeal, Defendant maintains that the video recording was irrelevant to prove the charged conspiracy because Mr. James and Mr. Ayers were confidential informants by September 7, and, as such, their conspiracy with Defendant had ceased. Defendant also asserts that the recording was inadmissible as evidence of his identity through a common scheme or plan, noting that the recording does not show his face, and that the only witnesses who were able to identify him as Fifty were Mr. James and Mr. Ayers, whose testimonies he maintains were uncorroborated. He also argues that the trial court erred by considering the recording as proof of his intent and that its prejudicial effect outweighed its probative value. The State responds that the trial court did not abuse its discretion in admitting the video recording into evidence because it helped to establish Defendant's identity. In the alternative, the State argues that any abuse of discretion by the trial court was harmless error because the trial court provided a curative instruction to the jury which instructed it not to consider the video recording as evidence of the charged conspiracy.

For evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Tenn. R. Evid. 403. Ordinarily, evidence of prior bad acts is inadmissible to show that a defendant acted in conformity with a character trait. Tenn. R. Evid. 404(b). Such

evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its unfair prejudicial effect. Tenn. R. Evid. 404(b); *State v. Wyrick*, 62 S.W.3d 751, 771-72 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before admitting such evidence, the trial court must: (1) hold a hearing outside the jury's presence upon request; (2) determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; (3) find the proof of the other crime, wrong, or act to be clear and convincing; and (4) exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(1)-(4).

When a trial court substantially complies with the procedural requirements of Rule 404(b), this Court will not overturn the ruling absent an abuse of discretion. *See State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005). "'Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" *State v. Parker*, 350 S.W.3d 883, 897 (Tenn. 2011) (quoting *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

The trial court complied with Rule 404(b)'s procedural requirements, so our review of its holding is limited to an abuse of discretion. The trial court held that the September 7 recording was admissible to prove Defendant's identity through a common scheme or plan and his "intent to engage in an ongoing conspiracy."

Here, the charged conspiracy began in early April of 2018, and the parties agree that it concluded when Mr. James and Mr. Ayers became confidential informants on September 5, 2018. With this in mind, no evidence emanating from the September 7 recording establishes Defendant's identity. Beyond that, the trial court found "the co-conspirators in the video were returning funds to [Defendant]" which "represented the proceeds of illegal narcotics sales that are the subject of the conspiracy allegations in the indictment." The record does not support this finding. The September 7 recording depicts Mr. James and Mr. Ayers handing Defendant a plastic bag, which they testified contained cash. However, both Special Agent Mabry and Detective McFerrin testified that these funds came not from their sales of Defendant's heroin but rather from the TBI. This, coupled with the fact that the exchange occurred after the charged conspiracy had concluded, leads us to the conclusion that the September 7 recording was inadmissible.

The State maintains that the September 7 recording is admissible to prove Defendant's identity by corroborating Mr. Ayers' and James's testimonies, but the State's proof was sufficient to corroborate their testimonies without reliance upon the recording.

Further, the State argues that the September 7 recording shows the white Jeep Grand Cherokee, which was critical to Detective McFerrin and Special Agent Mabry's later identification of Defendant. Again, this lends very little probative value to the recording which could be achieved through less prejudicial means—and indeed was achieved through testimony and the September 21 recording, which Defendant does not challenge. The trial court thus erred in admitting this evidence.

However, we conclude that the trial court's error in admitting this evidence was harmless. "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *see State v. Reynolds*, 635 S.W.3d 893, 928 (Tenn. 2021) (providing that when a trial court "admits evidence in violation of the Tennessee Rules of Evidence, we ordinarily address this non-constitutional error using the harmless error analysis of Rule 36(b)"). Any prejudice that resulted from the trial court's admission of the recording was cured by its limiting instruction to the jury to consider events occurring outside the charged conspiracy's timeframe purely for identification purposes rather than as proof of his guilt. *See State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994) (holding that "the jury is presumed to have followed" a trial court's instructions). Both the State and Defendant similarly admonished the jury. Having already concluded that the evidence was sufficient to convict Defendant, we find that the trial court's error in admitting the September 7 recording was harmless.

*Conclusion*

Based on our review, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE

- 15 -